## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RANDALL COREY ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cv-00439-TMP |
| | ) | |
| CITY OF HOMEWOOD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the court are two motions for summary judgment, the first filed by the defendants City of Homewood ("City"), Lt. Tim Ross ("Ross"),[1] and Officer Michael Jeffcoat ("Jeffcoat") on June 8, 2017 (doc. 49), and the second by Wal-Mart Stores East, L.P. ("Wal-Mart") on June 14, 2017 (doc. 54). The defendants seek to dismiss plaintiff's complaint, which consists of various federal-law and state law claims, in its entirety. The motion has been fully briefed, and the parties have consented to dispositive jurisdiction by a United States Magistrate Judge in accordance with 28 U.S.C. § 636(c).

---

[1] Ross has since become the City's Chief of Police. This memorandum opinion, however, refers to him in his capacity as a lieutenant at the time of incident giving rise to the above-styled action.

# I. PROCEDURAL HISTORY

Plaintiff Randall Corey Anderson[2] filed the original Complaint in this action on March 17, 2016, and named as defendants the City and Wal-Mart. (Doc. 1). Both the City and Wal-Mart filed motions to dismiss the complaint. (Docs. 3 and 5). On July 15, 2016, Anderson filed a First Amended Complaint, adding as defendants Ross, Jeffcoat, and David Roberts ("Roberts"). (Doc. 21).[3] Due to the filing of the First Amended Complaint, the previous motions to dismiss were deemed moot. (See doc. 35, p. 2 n.4).

On August 15, 2016, the City, followed by Ross and Jeffcoat, filed motions to dismiss, or alternatively for more definite statement. (Docs. 24 and 25). Wal-

---

[2] The court notes that Anderson changed his legal name to Rafa'el Hakiym-Bey on February 1, 2017, after the commencement of the above-styled action. (See doc. 54-1, p. 2 n.1; see also doc. 51-3, pp. 363:17 – 364:8).

[3] The court construed the First Amended Complaint to allege the following federal-law claims against the City, Ross, and Jeffcoat: First Claim—arrest without probable cause (Fourth Amendment) and denial of due process and equal protection (Fourteenth Amendment); Third Claim—use of excessive force in violation of the Fourth Amendment; Fourth Claim—arrest without probable cause (Fourth Amendment) and denial of equal protection (Fourteenth Amendment); and Fifth Claim—false imprisonment and denial of equal protection (Fourteenth Amendment). (Doc. 35, p. 13 n.9). The court held that the "Fourth Claim is essentially redundant of the First Claim." (Doc. 35, p. 21). Additionally, the Second Claim—specifically, for deliberate indifference to violation of the plaintiff's constitutional rights—applies only to the City and Wal-Mart.

The First Amended Complaint also alleged the following state-law claims against the City, Ross, and Jeffcoat: Sixth Claim—"official misconduct amounting to an abuse of judicial process"; Seventh Claim—tort of outrage; Eighth Claim—slander and false light; Ninth Claim—malicious abuse of process, false arrest, false imprisonment, "failure to train," "violation of constitutional & civil rights," and slander; Tenth Claim—assault and battery; and Eleventh Claim—failure to supervise and train agents and employees. (Doc. 35, p. 16).

Finally, the First Amended Complaint alleged the following state-law claims against Wal-Mart: Ninth and Eleventh Claim—failure to supervise and train agents and employees. (Doc. 35, pp. 36-38).

Mart and Roberts filed a motion to dismiss on August 15, 2016, as well. (Doc. 27).

The court subsequently entered a Memorandum Opinion and Order granting in part

and denying in part the motions to dismiss. (Docs. 35 and 36). As a result, the

following claims remain pending:

- Arrest of the plaintiff without probable cause in violation of the Fourth Amendment against the City, Ross, and Jeffcoat. (First and Fourth Claims)

- Denial of due process and equal protection in violation of the Fourteenth Amendment against the City (First and Fourth Claims)[4]

- Gross negligence against the City (Second Claim)

- Deliberate indifference to the need for further training of police officers with respect to making constitutionally proper arrests against the City (Second Claim)

- Use of unconstitutionally excessive force in making an arrest of the plaintiff in violation of the Fourth Amendment, against the City and Jeffcoat (Third Claim)

---

[4]    Upon further review of the Memorandum Opinion and Order dated December 27, 2016 (docs. 35 and 36), the court has determined that these claims remain pending against the City despite the summary of remaining claims at the end of the Memorandum Opinion (see doc. 35, pp. 41-42). Specifically, the court recognized that the First and Fourth Claims alleged that the City denied Anderson due process and equal protection in violation of the Fourteenth Amendment. The court held that "[i]nsofar as the City's motion to dismiss seeks dismissal of federal-law claims, it is DENIED." (Doc. 35, p. 14). Furthermore, the court ordered as follows: as to "[t]he motion to dismiss filed by the City of Homewood . . . is DENIED as to the plaintiff's federal claims (First Claim, Third Claim, Fourth Claim, and Fifth Claim). . . ." (Doc. 36, p. 1). Accordingly, the First and Fourth Claims—denial of due process and equal protection in violation of the Fourteenth Amendment against the City—remain pending. In setting out the claims that then remained pending, the court erroneously overlooked the equal protection and due process claims in the First and Fourth Claims of the First Amended Complaint.

- False imprisonment in violation of 42 U.S.C. § 1983 and denial of equal protection in violation of the Fourteenth Amendment against the City (Fifth Claim)

- Negligent slander and false-light invasion of privacy against the City (Eighth Claim)

- Common law false arrest and false imprisonment against the City, Ross, and Jeffcoat (Ninth Claim)

- Assault and battery against the City and Jeffcoat (Tenth Claim)

- Negligent failure to train against the City (Ninth and Eleventh Claims)

- Negligent, wanton, intentional failure to train employees regarding the proper circumstances under which to sign a criminal complaint for trespass against Wal-Mart (Ninth and Eleventh Claim)

(Doc. 36, pp. 1-4). On December 27, 2016, the City filed a motion to reconsider. (Doc. 37). The court granted the motion on February 8, 2017, holding that punitive damages were not available as a remedy against the City. (Doc. 41). Each of the defendants subsequently filed an Answer to the First Amended Complaint on January 10, 2017. (Docs 38, 39, and 40).

After twice extending the deadline to file dispositive motions (docs. 43 and 47), the City, Ross, and Jeffcoat filed a motion for summary judgment on June 8, 2017 (doc. 49), and Wal-Mart filed a motion for summary judgment on June 14, 2017 (doc. 54). Anderson filed responses in opposition to the two motions on September 6, 2017, although the reason for the delay is not clear from the record.

(Doc. 57 and 58). The City, Ross, and Jeffcoat filed a reply on September 14, 2017 (doc. 60), and Wal-Mart filed a reply on September 21, 2017 (doc. 61).

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions,

answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc.
v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there
is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a
claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d
379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a
genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir.
2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50
(11th Cir. 2004). If the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted. Anderson, 477 U.S. at 249
(citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).
Furthermore, the court must "view the evidence presented through the prism of the
substantive evidentiary burden," so there must be sufficient evidence on which the
jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v.
Storer Communications, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless,
credibility determinations, the weighing of evidence, and the drawing of inferences
from the facts are the function of the jury, and therefore the evidence of the non-
movant is to be believed and all justifiable inferences are to be drawn in his favor.
Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every

inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

### III.  FACTS

For purposes of summary judgment, the courts are directed to view the facts in the light most favorable to the non-moving party, which, in this case, is Anderson.  Accordingly, the following facts are relevant to the instant motions for summary judgment.

On December 26, 2014, Anderson was in Birmingham, visiting family over the Christmas holiday.  (Doc. 54-2, pp. 75:13 – 76:7).  Although he grew up in Birmingham, Anderson lives in Fulton County, Georgia.  (Doc. 54-2, pp. 23:1-17, 7:6-14).  Anderson arrived at the Wal-Mart store on Lakeshore Parkway, in Homewood, Alabama, on December 26 at approximately 4:15 p.m. to purchase drinks and snacks to take to his cousin's home.  (Doc. 54-2, pp. 84:22 – 85:19, 102:12 – 103:6).

Anderson first saw Black Lives Matter ("BLM") protestors while he was at the traffic light on Lakeshore Parkway waiting to turn into Wal-Mart.  (Doc. 54-2, p. 106:13-19).  He was neither aware of any planned demonstration at Wal-Mart when he arrived (doc. 54-2, pp. 80:10 – 81:8) nor involved in the protest (<u>see</u> doc.

54-4, pp. 262:21 – 263:12).[5]  Furthermore, he maintains that he had not previously participated in a BLM demonstration or protest.  (Doc. 54-2, pp.74:20 – 75:5).  After he parked his car in the Wal-Mart parking lot, he stood outside his car to watch the BLM protestors as they made their way from Lakeshore Parkway, through the Wal-Mart parking lot, into the Wal-Mart store itself, and then back out to the parking lot to return to Lakeshore Parkway.  (Doc. 54-2, pp. 108:15 – 111:4, 113:15 – 114:17, 118:19 – 119:20, 120:10 – 121:15).    While he was at his car observing the BLM protest, his friend and another man joined him.  (Doc. 54-2, pp. 117:6-13, 122:15 – 123:2).

Once the protestors returned to the crest of Wal-Mart Drive near where it intersects with Lakeshore Parkway, at approximately 5:00 p.m., the police ordered the protestors to disperse.  (Doc. 54-2, p. 130:6-23; see also doc. 54-4, pp. 286:21 – 287:4).  Anderson had been in the parking lot for approximately thirty to forty-five minutes watching the protest.  After the police's command to disperse, Anderson noticed Mercutio Southall, one of the protestors, approach his small group and greet Anderson's friend.   (Doc. 54-2, pp. 134:17 – 137:19, 139:17 – 140:9).  Although the protestors were dispersing, Anderson and his group did not begin to

---

[5]    A fact dispute exists as to whether Anderson participated in the BLM protest.  Although Ross and Roberts testified that Anderson participated in the protest (doc. 54-7, p. 13:4-7; doc. 54-6, p. 3, ¶ 10), Anderson denies any involvement in the protest.  Furthermore, upon review of the video, Ross asked Anderson whether he was part of the protest.  (Doc. 52).  Before he could answer, Ross cut Anderson off and ordered him to leave.  (Id.).  Ross's question indicates that he was not sure of Anderson's involvement in the demonstration.  Accordingly, the court must view the fact in a light most favorable to Anderson, i.e., that he did not participate in the BLM protest.

leave because they were having a conversation unrelated to the protest. (Doc. 54-2, pp. 138:23 – 139:8). During this time, however, Anderson did overhear "the police telling everybody to leave," as the police generally followed the protestors into the parking lot to ensure the protestors actually left the premises. (Doc. 54-2, p. 150:1-13).[6] Anderson, however, did not hear anybody from Wal-Mart ask him or his group to leave the property. (Doc. 54-2, p. 139:9-11). According to Anderson, nobody told his group to leave "until what was heard on the video." (Doc. 54-2, p. 149:8-11).

Approximately one minute after Southall stopped to talk to his group, six or seven officers approached Anderson's group; specifically, the officers walked past Anderson to engage Southall. (Doc. 54-2, pp. 145:9 – 146:22). After the officers approached his group, Anderson began using his cellphone to record the officers' interaction with Southall when Ross asked Southall: "Do you need to go to jail today?" (Doc. 54-2, pp. 146:23 – 147:23; see also doc. 52).[7] Southall failed to comply with Ross's order to produce identification, and Ross directed an officer to arrest Southall. (Doc. 54-2, pp. 152:22 – 154:20; see also doc. 52). Jeffcoat

---

[6]     Anderson did not see the police go "from group to group, . . . telling people to leave." (Doc. 54-2, p. 150:1-8).

[7]     A fact dispute exists as to what Ross first said to Southall. Anderson testified under oath that he thought Ross's "first words sounded like did you know you're going to jail today[,]" but further review of the video supplied to the court, the court finds that Ross asked: "Do you need to go to jail today?" (See doc 54-2, p. 147:11-23; see also doc. 52). Accordingly, the court will not view the fact in a light most favorable to Anderson, the non-movant, based on the video evidence. See Scott v. Harris, 550 U.S. 372 (2007).

initially assisted with the arrest, arriving after Ross initiated contact with Southall. (Doc. 51-5, p. 13:9-20).[8]   Although no one asked him to stop recording the encounter, Corporal Carr ("Carr") did direct Anderson to step back during Southall's arrest, using his baton demonstratively.  (Doc. 54-2, pp. 154:21 – 155:22; see also doc. 52; doc. 54-7, pp. 17:17 – 18:3).

During Southall's arrest, Ross went over to the other two men in Anderson's group and twice ordered them to leave.  (Doc. 54-2, pp. 156:13 – 157:16; see also doc. 52).   Both men, who were several feet away from Anderson at the time, complied with Ross's second order after Ross said, "Goodbye."   (Doc. 54-2, p. 157:3-16; see also doc. 52).  They were not arrested.  It is clear from the video that Ross's orders to the two men were specifically directed to them and not Anderson. (See doc. 52).

After Ross ordered the other two men to leave, Ross approached Anderson and ordered him to leave the scene as well, or to go with Southall.  (Doc. 54-2, pp. 163:10 – 164:5; see also doc. 52).   Anderson immediately began to move toward his car after Ross told him to leave; however, he continued to video the encounter as he moved toward his car.  (Doc. 54-2, pp. 164:15 – 165:7; see also doc. 52). Anderson testified that he turned his body to walk towards his car although his

---

[8]      Specifically, upon review of the video, Ross asked Southall for identification.  (See Doc. 52). When asked by Southall to explain the probable cause that Ross possessed to ask for Southall's identification, Ross explained that he was criminally "trespassing" Southall from the property (colloquialism for warning or removing a trespassing person from property).  (Id.).

camera remained pointed at Southall, who was struggling and resisting arrest, while he walked the five to seven feet toward his car. (Doc. 54-4, pp. 322:4 – 323:23; see also doc. 52). Once he reached the hood of his car, Ross ordered that Anderson be arrested for "not moving fast enough." (Doc. 54-2, pp. 165:11 – 167:3; see also doc. 52).[9] Carr slammed Anderson onto the hood of Anderson's car, and Jeffcoat eventually placed the handcuffs on Anderson after noticing the struggle. (See doc. 51-5, pp. 28:6 – 30:20). Jeffcoat placed handcuffs on Anderson so tightly that the handcuffs pinched and bruised Anderson's wrists. (Doc. 54-2, pp. 167:19 – 168:23).

Soon thereafter, an unidentified officer turned Anderson around and allowed him to lean on the front of his car after Anderson asked if he could sit on the ground. (Doc. 54-2, p. 171:1-12). Once an officer began to take him to a police car, the officer loosened his handcuffs upon Anderson's request. (Doc. 54-2, p. 171:1-12). Anderson suffered minimal abrasions and bruising to his wrists, which did not require medical treatment (doc. 54-3, pp. 191:17-21, 205:20-22; doc. 55, pp. 7-8) and a few scratches to his car (doc. 55, pp. 5-6).

An unidentified officer then transported Anderson to jail. (Doc. 54-2, p. 170:11-14). At the jail, Anderson learned he was arrested for trespassing, failure

---

[9] Although Ross testified that Anderson maneuvered his body to get closer to Southall after Ross ordered him to leave (doc. 54-7, pp. 20:6 – 21:23), that does not seem to appear on the video (see doc. 52).

to obey an officer,[10] and possession of a firearm at a demonstration. (Doc. 54-4, p. 338:10-23; see also doc. 54-7, pp. 34:15 – 35:10). Jeffcoat prepared the incident report and the arrest report. (Doc. 51-5, pp. 16:9-18, 17:6-12). The City posted Anderson's mugshot on the City's Facebook page. (Doc. 54-7, pp. 38:11 – 39:8). Anderson additionally posted the video of his arrest to his own personal Facebook page. (Doc. 54-4, pp. 253:8-23; 360:7 – 361:11).

Although he heard the police order the protestors to disperse and leave the property (doc. 54-2, p. 130:6-23; doc. 54-4, pp. 271:14 – 272:5) and he heard Ross order the other two men in his group to leave (doc. 54:2, p. 156:13-17), Anderson denies that the police ordered him three times to leave before he was arrested (doc. 54-4, pp. 235:4-10).[11] Anderson did not think that the orders to the protestors

---

[10]   The court notes that there is no actual offense under Title 13A of the Alabama Code (LexisNexis 2015) denominated in this way. Alabama Code § 13A-11-7(a)(6) defines a form of disorderly conduct as "Congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of law enforcement to disperse." Also, while Alabama Code § 32-5A-4 makes it unlawful for any person who "willfully fail[s] or refuse[s] to comply with any lawful order or direction of any police officer . . . invested by law with authority to direct, control, or regulate traffic," this statute does not apply to every order by a police officer. See Coughlin v. State, 56 Ala. App. 225, 229 (1975) (holding that statute did not apply to incident "three feet off the roadway" and order "to 'go back in the house'"). This statute applies only to orders "directly related to the direction, control and regulation of traffic." Coughlin, 56 Ala. App. at 229.

[11]   A fact dispute exists as to whether Ross asked or verbally directed Anderson to leave multiple times before he ordered Anderson's arrest after Anderson allegedly failed to comply with Ross' "last" command to leave. For the sake of clarity, Ross did give Anderson three orders to leave in a matter of a few seconds when Ross approached Anderson after he ordered Anderson's friends to leave (i.e., in one continuous transaction lasting a matter of a five to seven seconds). As soon as Ross finished giving his order, Anderson began to move towards his car. (Doc. 54-4, p. 235:11-23; see also doc. 52). To the extent that the defendants argue that Ross

to leave applied to him because he was not part of the protest. (Doc. 54-4, p. 286:13-18). According to Anderson, Ross "wasn't talking directly to" him when Ross gave orders to the protestors to disperse and then to the two other men in his group to leave. (Doc. 54-2, p. 162:9-13). Anderson also asserts that Ross personally ordered him to leave only once. (Doc. 161:3-7; see also doc. 54-4, pp. 239:14 – 240:4; doc. 52). However, Ross gave Anderson's group a demonstrative hand signal to leave the property. (Doc. 54-7, pp. 14:9 – 15:8; doc. 54-5, pp. 17:1-8, 19:20 – 20:9). Then, Southall gave the hand signal back to Ross. (Doc. 54-7, pp. 14:9 – 15:8).[12] Once it became apparent that the group would not leave, Ross approached Anderson's group. (Doc. 54-7, pp. 14:9 – 15:8).

On the date of the incident, Roberts was the store manager of the Wal-Mart located in Homewood, Alabama, and he was present at the time of the BLM protest. (Doc. 54-5, pp. 7:21 – 8:2, 9:13-19). To become manager, Roberts went through extensive and ongoing training, which included training on how to properly "trespass"[13] an individual from Wal-Mart's property. (Doc. 54-6, pp. 1-2,

gave Anderson three separate verbal orders to leave at three separate times, however, Ross did not do so based on inferences taken in favor of the non-movant, Anderson.

[12]    Although Anderson denies that he was previously ordered to leave the premises "until [Ross] approached [him] and spoke directly to [him]" (doc. 54-2, p. 161:3-7; see also doc. 54-4, pp. 239:14 – 240:4), the mere fact that Anderson presumably did not see the hand signal does not dispute that it happened. Both facts can coexist, i.e., it is true that (1) Ross gave the hand signal to Anderson's group (which Anderson did not see) and (2) Ross verbally directed Anderson to leave only once.

[13]    See supra note 8, at 11, for colloquial definition.

¶ 3).  According to Wal-Mart policy, only a store manager or designated agent "can sign a warrant for criminal trespass."  (Doc. 54-6, pp. 2, ¶ 3).  After learning about a planned demonstration at Wal-Mart from the Homewood Police Department ("HPD"), Roberts requested HPD's assistance.  (Doc. 54-5, pp. 9:21 – 10:5, 14:19-22).  Then-Chief of Police Jim Roberson was present at Wal-Mart and was in charge of the police presence.  (Doc. 54-7, p. 11:11-15).  Ross also was present, in a supervisory position (doc. 54-7, p. 11:16-23), but operational command ultimately belonged to Lieutenant Ken Atkinson (doc. 54-7, pp. 22:16 – 23:3).

Roberts asserts that he "personally trespassed several groups of demonstrators from Wal-Mart's premises using a prepared statement from Wal-Mart's corporate office."  (Doc.54-6, p. 3, ¶ 9).  He claims that he read the prepared statement "both inside the store and outside the store in the parking lot," walking "with a police officer from group to group of all remaining demonstrators at the top of the parking lot" and reading the prepared statement.  (Doc. 54-6, p. 3, ¶¶ 9, 10).  Anderson maintains that he "never had any contact with the Wal-Mart manager" (doc. 54-4, p. 350:2-23),[14] and he states that no one from Wal-Mart came up to his group and asked him to leave.  (Doc. 54-2, p. 139:9-11).

---

[14]     A fact dispute exists as to whether Roberts actually read a trespassing warning to Anderson.  Although Roberts testified to giving Anderson a warning to leave the premises and "recalls seeing [Anderson] walk from a group of demonstrators [he] had just trespassed to join

Roberts went to the Homewood, Alabama, magistrate's office on December 26, 2014, to sign a complaint for criminal trespass against Anderson and Southall based on the earlier events from that evening. (Doc. 54-5, p. 13:16-18). Because of Robert's complaint, the City charged Anderson only with criminal trespass in the third degree. (Doc. 54-7, p. 35:12-18). Anderson pleaded guilty to criminal trespass in the City of Homewood Municipal Court and appealed that plea for a *de novo* jury trial. (Doc. 54-4, pp. 335:8-11; 362:2-12). In the Jefferson County Circuit Court, Anderson saw Roberts for the first time, and Roberts was not sure he recognized Anderson or knew Anderson. (Doc. 54-3, p. 181:2-12). The jury acquitted Anderson. (Doc. 54-4, pp. 362:16 – 363:1).

---

two other men standing in the parking lot" (doc 54-5, p. 13:19-21; doc. 54-6, p. 3, ¶ 10), Anderson does not recall any interactions with Roberts or any other employee of Wal-Mart. Furthermore, Roberts' own testimony undercuts his assertion. When asked what he said to Anderson, Roberts testified:

> I read a warrant to a group of individuals. It was a prepared statement given to me by corporate office . . . I probably didn't see any individuals in the group . . . As I was reading the documentation, I read it verbatim, because that's what we're trained to do. So I did not look up and make eye contact with the individuals. . . .

(Doc.54-5, p. 14:1-13). While Roberts did read the warning statement to others, it is not clear whether he actually read it to Anderson, either personally or as a member of a group. Accordingly, the court must view the fact in a light most favorable to Anderson, *i.e.*, that Anderson did not encounter Roberts at any time that Roberts read the prepared warning. (Doc. 54-4, p. 350:4-23; see also 54-2, p. 149:8-11).

## IV. DISCUSSION

### A. Federal-Law Claims (First, Second, Third, Fourth, and Fifth Claims) against the City

#### 1. *Municipal Liability*

Although Anderson may directly sue the City, the City cannot be held vicariously liable for the actions of its employees under a theory of *respondeat superior*. Monell v. Dep't of Social Services of City of N.Y., 436 U.S. 658, 690-91 (1978). In other words, the City may not "be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. at 691; see also Skop v. City of Altanta, Ga., 485 F.3d 1130, 1145 (11th Cir. 2007). Notably, "[a] 'municipal act' is not . . . limited to decisions made by the city's official legislative body or in written agreements. City policy also may be implicated by the acts of individual policymaking officials or by pervasive city custom." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1480 (11th Cir. 1991).

The City argues that it is not liable under Monell or through Ross as a final policymaker. Anderson asserts that Ross was a final policymaker capable of imputing liability to the City.

#### a. *Final Policymaker*

In Pembaur v. City of Cincinnati, the Supreme Court held that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." 475 U.S. 469, 481

(1986).  Without "responsib[ility] for establishing final government policy," even an official with discretionary authority does not "give rise to municipal liability based on an exercise of that discretion."  Id. at 482 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822–824 (1985)).  Thus, only a government official with final policymaking authority "may by his . . . action subject the government to [42 U.S.C.] § 1983 liability when the challenged action falls within that authority." Brown, 923 at 1480.

Here, however, no evidence in the record establishes that Ross possessed final policymaking authority.  On the date of the incident, Ross was only a patrol lieutenant, not the Chief of Police, meaning that he did not have the final policymaking authority to establish or modify the City's arrest policy and procedure.  Furthermore, while Ross gave the order to arrest Anderson, Ross was not the highest ranking officer on the scene.  Ross testified that then-Chief of Police Roberson was present and that Lieutenant Atkinson possessed operational command over the scene.  Accordingly, either Roberson or Atkinson possessed the final policymaking authority as to who would be arrested that evening.  Therefore, Ross's order to arrest Anderson cannot rise to the level of final policymaking authority to impose liability on the City because (1) he did not have the authority to establish or change the City's arrest policy and (2) he was not the highest ranking officer on the scene on the date of the incident.  Therefore, the City is not liable to

Anderson for the First, Third, Fourth, or Fifth Claims because Ross was not a final policymaker at the time of the arrest and its related consequences.

b. *City Policy or Custom*[15]

As to a policy or custom, to establish 42 U.S.C. § 1983 municipality liability, Anderson must prove: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is "a practice that is so settled and permanent that it takes on the force of the law." Id. at 1290 (internal quotation marks omitted). For a custom or policy to be actionable, the plaintiff must show that the custom or policy is "persistent and wide-spread." Id. In contrast, "random acts or isolated incidents are insufficient to establish a custom or policy." Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). For the city to be liable for the custom, "actual or constructive knowledge of such customs must be attributed to . . . the municipality." Id. Constructive knowledge exists when "a longstanding and widespread practice is

---

[15] Notably, from this point forward, the court finds that Anderson has abandoned his remaining claims against the City, Ross, and Jeffcoat by failing to respond to the legal arguments advanced by the defendants. Solutia, Inc., v. McWane, Inc., 672 F.3d 1230, 1239 (11th Cir. 2012) (quoting Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 598 (11th Cir. 1995) ("Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). However, the court elects to consider each of Anderson's claims against the City, Ross, and Jeffcoat despite the clear abandonment of his claims.

deemed authorized by the policymaking officials because they must have known about it but failed to stop it." <u>City of Fort Lauderdale</u>, 923 F.2d at 1481.

Even assuming that he could establish a constitutional violation, Anderson has failed to come forward with any evidence whatsoever establishing a "persistent and wide-spread" custom or policy by the City of allowing officers to arrest civilians without probable cause in violation of the Fourth Amendment. Additionally, Anderson did not present any evidence of a "persistent and wide-spread" custom or policy by the City of allowing officers to use excessive force or to falsely imprison civilians. Anderson presented evidence detailing only his arrest and imprisonment, which can be characterized as nothing more than an "isolated event." He has not produced evidence of other arrests without probable cause, arrests with excessive force, or false imprisonment without due process throughout the City. Therefore, the City is not liable to Anderson under <u>Monell</u> for the First, Third, Fourth, or Fifth Claims.

Accordingly, summary judgment is due to be granted in favor of the City on these federal-law claims because municipal liability does not attach. Therefore, the First, Third, Fourth, and Fifth Claims against the City are due to be dismissed.

### 2. *Deliberate Indifference*

In <u>Connick v. Thompson</u>, the Supreme Court held that "a local government's decision not to train certain employees about their legal duty to avoid violating

citizens' rights may rise to the level of an official government policy for purposes of § 1983." 563 U.S. 51, 61 (2011). However, the Supreme Court warned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. Id.; see also Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). Here, the same concerns ring true. Although Anderson argues that the City failed to train Ross and Jeffcoat, the City asserts that Anderson has failed to demonstrate deliberate indifference.

To raise a sufficient failure-to-train claim under § 1983, the City's failure to train its officers in making arrests with probable cause and without using excessive force "must amount to 'deliberate indifference to the rights of persons with whom the [the officers] come into contact.'" Connick, 563 U.S. at 61 (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). "Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'" Id. (quoting City of Canton, 489 U.S. at 388-89); see also Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998) [hereinafter "Gold II"]. Therefore, "[t]o establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality [knew] of a need to train and/or supervise in a particular area and the municipality made a

deliberate choice not to take any action." Gold II, 151 F.3d at 1350. Without

notice, "a municipality is not liable as a matter of law for any failure to train or

supervise." Id. at 1351. In Wright v. Sheppard, the Eleventh Circuit held that a

sheriff's department was not liable under a failure-to-train theory because there

was "no evidence of a history of widespread prior abuse . . . [to] put the sheriff on

notice of the need for improved training or supervision." 919 F.2d 665, 674 (11th

Cir. 1990).

Here, Anderson has not proffered any evidence, nor does the record contain

any evidence, indicating that the City had notice of a need to improve the training

of its officers in making arrests and using lawful force. Likewise, there is no

evidence in the record specifically indicating a widespread problem of which the

City was aware. Finally, Anderson does not identify specific deficiencies in the

arrest or in lawful policies of the City. See Knight through Kerr v. Miami-Dade

County, 856 F.3d 795, 820 (11th Cir. 2017) (affirming summary judgment denial

of failure-to-train claim).[16] Although he finds fault with Ross's and Jeffcoat's

actions, Anderson has not identified any problem in the City's training. See City

of Canton, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily

---

[16] Although the Supreme Court hypothesized a narrow range single-incident liability for a failure-to-train claim in City of Canton, the Court appeared to limit such liability to a factual scenario involving the need for training "in the constitutional limitations on the use of deadly force." See City of Canton, 489 U.S. at 390 n.10; see also Connick, 563 U.S. at 64; Gold II, 151 F.3d at 1352 (citing Board of County Comm'rs v. Brown, 520 U.S. 397 (1997)). Single-incident liability is not implicated by the facts before the court.

trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). Accordingly, summary judgment is due to be granted for any deliberate indifference, failure-to-train claim as to the City, and the claim is due to be dismissed.

### B. Federal-Law Claims against Ross and Jeffcoat

#### 1. *Qualified Immunity Framework*

Officers sued in their individual capacities may raise qualified immunity as a defense. Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).[17] Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). At its core,

---

[17]     Although not clear from the face of the complaint, Anderson asserts the federal-law claims against Ross and Jeffcoat in their individual capacities. As the Supreme Court explained in Kentucky v. Graham, "[o]fficial-capacity suits... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" 473 U.S. 159, 165–66 (1985) (quoting Monell, 436 U.S.at 690, n.55); see also Busby, 931 F.2d at 776. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Graham, 473 U.S. at 165–66; see also McElroy v. City of Birmingham, 903 F. Supp. 2d 1228, 1242 (N.D. Ala. 2012). Therefore, "[w]hen suit is also filed against the local government entity, the court should dismiss the individual defendant in [their] official capacity[ies] as 'redundant and possibly confusing to the jury.'" Busby, 931 F.2d at 776. Therefore, because he named the City as a defendant in this action, Anderson brought the claims under § 1983 against Ross and Jeffcoat in their individual capacities.

qualified immunity balances "the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation." Kingsland v. City of Miami, 382 F.3d. 1220, 1231 (11th Cir. 2004). Essentially, "[q]ualified immunity 'gives ample room for mistaken judgments' but does not protect 'the plainly incompetent or those who knowingly violate the law.'" Kingsland, 282 F.3d at 1231-32 (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)). These broad principles guide the court.

Qualified immunity first requires Ross and Jeffcoat to prove that they were "'acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred.'" Kingsland, 382 F.3d at 1232 (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Because Anderson has not disputed that Ross and Jeffcoat were "acting within the scope of [their] discretionary authority" when Ross ordered Anderson's arrest and Jeffcoat placed handcuffs on Anderson, "the burden shifts to [Anderson] 'to show that qualified immunity is not appropriate.'" Stephens v. DeGiovanni, 852 F.3d 1298, 1314 (11th Cir. 2017) (quoting Lee, 284 F.3d at 1194).

Because the burden has shifted to Anderson, qualified immunity now requires Anderson to answer two inquiries in the affirmative. See Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010). The first inquiry asks Anderson whether his constitutional rights have been violated. Brown, 608 F.3d at

734; see e.g., Stephens, 852 F.3d at 1314. The second inquiry asks Anderson "whether the right violated was 'clearly established.'" Id.; see e.g., Stephens, 852 F.3d at 1314. Anderson must answer both inquiries in the affirmative for Ross and Jeffcoat "to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Id. (citing Person v. Callahan, 555 U.S. 223 (2009)).

### 2. *Arrest without Probable Cause against Ross and Jeffcoat*

The Fourth Amendment establishes that "an individual has a right to be free from 'unreasonable searches and seizures.'" Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007). Under the Fourth Amendment, "an arrest is a seizure of the person . . ., and the 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest." Id. The Eleventh Circuit universally recognizes that "[a]n arrest without a warrant and lacking probable cause violates the [Fourth Amendment] and can underpin a § 1983 claim, but the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." Brown, 608 F.3d at 734; see e.g., Case, 555 F.3d at 1326-27. As to arrests, probable cause "exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."

Case, 555 F.3d at 1327 (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992)) (internal quotation marks omitted).

Anderson argues that Ross and Jeffcoat arrested him without probable cause. Ross and Jeffcoat argue that they are entitled to qualified immunity. Although Ross and Jeffcoat do not expressly contend that they had probable cause to arrest Anderson (see doc. 50, pp. 9-12) (failure to argue the existence of probable cause), the undisputed evidence in the record supports such a finding. The officers were in the process of dispersing demonstrators when Ross encountered Anderson. Ross had verbally and by hand signal instructed people near Anderson to leave. At the time, Anderson was talking with Southall, who clearly was part of the demonstration. When officers arrested Southall, the plaintiff began to video the arrest, indicating his association with Southall. And, finally, when Anderson was instructed to leave, he moved "too slowly" in Ross's opinion (unlike two earlier men whom Ross instructed to leave and were not arrested when they left). Therefore, the court first finds that Ross and Jeffcoat has sufficient probable cause to arrest Anderson for trespassing.[18] Thus, the plaintiff has not satisfied the first inquiry under qualified immunity, i.e., that Ross and Jeffcoat violated his right to be free from unreasonable seizure without probable cause.

---

[18] Although not argued by any party, the court notes that when Anderson *de novo* appealed his conviction to the Circuit Court of Jefferson County for a jury trial, he was acquitted by the jury. This suggests that the trial judge found the charge sufficient to submit it to the jury rather than dismiss it on an Ala. R. Crim. P. 20.1 motion at the conclusion of the prosecution's case in chief. That action may imply adequate probable cause to arrest.

Even assuming a lack of probable cause, Ross and Jeffcoat "may still be shielded from liability [if their] 'actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Case, 555 F.3d at 1327 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)) (internal quotation marks omitted). If a constitutional violation occurred, Anderson must also demonstrate that this right was "clearly established," which requires a determination of "whether arguable probable cause existed." Case, 555 F.3d at 1327. In other words, even assuming they lacked probable cause to arrest Anderson, Ross and Jeffcoat are "still entitled to qualified immunity if arguable probable cause existed." Id.; see also Skop, 485 F.3d at 1137 ("While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity. . . . [E]ven if we determine that the officer did not in fact have probable cause, we apply the standard of 'arguable probable cause'. . . .").

In Brown, the Eleventh Circuit concluded that "[a]guable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the Plaintiff." 608 F.3d at 734 (quoting Kingsland, 382 F.3d at 1232). Arguable probable cause provides a defense to Ross and Jeffcoat if they

"reasonably but mistakenly conclude[d] that probable cause" existed.  Id. at 735

(quoting Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990)).

The presence of arguable probable cause "depends on the elements of the

alleged crime . . . and the operative fact pattern.  Skop, 485 F.3d at 1137-28.

However, "[a]guable probable cause does not require an arresting officer to prove

every element of a crime . . . before making an arrest, which would negate the

concept of probable cause and transform arresting officers into prosecutors."

Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001).  Ross and Jeffcoat

arrested Anderson for criminal trespass in the third degree, which states that "[a]

person is guilty of criminal trespass . . . when he knowingly enters or remains

unlawfully in or upon premises."  Ala. Code §13A-7-4 (LexisNexis 2015).  Under

§ 13A-7-1(3), "[a] person who, regardless of his intent, enters or remains in or

upon premises which are at the time open to the public does so with license and

privilege unless he defies a lawful order not to . . . remain, personally

communicated to him by the owner of such premises or other authorized person."

In a recent opinion, the Eleventh Circuit analyzed whether officers were

entitled to qualified immunity for their actions in arresting protestors.  Gates v.

Khokhar, 884 F.3d 1290 (11th Cir. 2018).  In Gates, Atlanta police officers

arrested Gates for wearing a mask during a protest in violation of a Georgia statute.

Gates acknowledged that an officer ordered protestors to remove their masks over

a loudspeaker, although Gates claims he did not hear the warning. When Gates

failed to comply, he was arrested. As interpreted by the Georgia Supreme Court,

"a person can be convicted of violating [the statute] only if the State also proves

that . . . the wearer of the mask "knows or reasonably should know that [his]

conduct provokes a reasonable apprehension of intimidation, threats, or violence.'"

Gates, 884 F.3d at 1299.

The Eleventh Circuit held that the arresting officers possessed arguable

probable cause to arrest Gates, which entitled the officers to qualified immunity on

Gates's § 1983 claim for arrest without probable cause. Gates, 884 F.3d at 1300.

The court reasoned:

> Like some other protesters, Plaintiff was wearing a mask that covered
> his entire face, and thus concealed his identity, during this night-time
> protest. That conduct might be sufficient by itself to suggest an intent
> to intimidate. But there is more: the calculus changed dramatically
> when the police repeatedly asked the masked protesters to remove
> their masks, else be arrested. Notwithstanding this command,
> Plaintiff nonetheless persisted, in what could reasonably be perceived
> as defiance of this lawful order by the police. A reasonable officer
> could infer that Plaintiff intended to intimidate based on such conduct,
> or, at the least, infer that Plaintiff could reasonably foresee that his
> behavior would be viewed as intimidating. . . .
>
> That Plaintiff now alleges he did not hear [the officer]'s warnings to
> remove his mask is immaterial. For purposes of our qualified
> immunity analysis, "we look only to whether a reasonable officer,
> knowing what [Defendants] knew at the time, objectively could have
> believed probable cause existed." *See Brown*, 608 F.3d at 736
> (emphasis added). Here, over a loud speaker, the police issued

> multiple warnings directing protestors to remove their masks. Given all the surrounding circumstances, an objective officer could reasonably have interpreted Plaintiff's refusal to comply with multiple orders to remove his mask as a gesture intended to intimidate. *See id.* . . .

Id. at 1301. The court finds <u>Gates</u> immensely persuasive to the holding that Ross and Jeffcoat possessed arguable probable cause.

Here, Ross and Jeffcoat possessed at least arguable probable cause to arrest Anderson for criminal trespass in the third degree. As an initial matter, Ross and Jeffcoat qualify as "authorized person[s]" under Alabama Code § 13A-7-4 and 1(3). Roberts, the Wal-Mart manager, requested the assistance of HPD in response to the BLM demonstration. An officer first ordered the BLM protestors to disperse while the protestors were gathered at the crest of Wal-Mart Drive, near where it intersects with Lakeshore Parkway. Anderson testified that he heard the officer's command to the protestors to leave the premises. After the officer's first command, Anderson admits that he heard the police tell "everybody to leave" as the police generally followed the protestors from the crest of Wal-Mart Drive into Wal-Mart's parking lot, even though the police did not go from group to group.

Even taking the facts in a light most favorable to Anderson (that is, that Anderson was not involved in the protest), Anderson's presence in the parking lot, conversing with Southall, could have signaled to a reasonable officer that Anderson was part of the dispersing protestors. More fundamentally, however, a

reasonable officer could have believed that the second command for "everybody to leave" applied to everyone who was in the middle to upper portion of Wal-Mart's parking lot. Just like in <u>Gates</u>, by giving the order for "everybody to leave," a reasonable officer would possess arguable probable cause that anybody who did not proceed to leave immediately was remaining unlawfully in Wal-Mart's parking lot in violation of § 13A-7-4. Anderson does not dispute that he heard the command for "everybody to leave." Irrespective of Anderson's subjective belief that the command did not apply to him, a reasonable officer could have believed that Anderson was part of the dispersing protestors and was ignoring the officer's command. <u>See</u> <u>Gates</u>, 884 F.3d at 1301.

Even after the second command for "everybody to leave," Ross gave a demonstrative hand signal for the group to leave, although it is unclear whether Anderson saw the signal. Ross then approached Anderson's group when it appeared that the group was not going to leave the property as instructed. At this point, Ross ordered one of his subordinates to arrest Southall for criminal trespass. Ross subsequently ordered the two other men in Anderson's group to leave the property (which they did) before turning his attention to Anderson and ordering Anderson to leave. Although Anderson began to comply with Ross's order, Anderson appeared to move slowly to leave the premises, and he continued to video the encounter. Given the number of orders to leave that Anderson had been

given, whether personally directed to him or not, a reasonable officer could have believed that Anderson was not going to immediately leave, but continue to remain in the area. A reasonable officer could have believed Anderson was only moving to a new vantage point, given that he was still recording Southall's arrest.

Ross and Jeffcoat possessed arguable cause to arrest Anderson for criminal trespass based on orders given by the police and Anderson's conduct despite those orders. Accordingly, summary judgment is due to be granted for any claim of arrest without probable cause as to Ross and Jeffcoat, and the First and Fourth Claims against Ross and Jeffcoat are due to be dismissed.

### 3. *Excessive Force Claim against Jeffcoat*

As the Supreme Court recognized in Graham v. Connor, "[i]n addressing an excessive force claim brought under § 1983, [the] analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." 490 U.S. 386, 394-95 (1989). Most excessive force claims will be grounded in "either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." Id. at 394; see also Lee, 284 F.3d at 1197.

The Fourth Amendment applies to "the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197 (citing Graham, 490 U.S. 386, 394-95 (1989)). An officer's right "to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Brown, 608 F.3d at 737 (internal quotation marks omitted). Anderson argues that Jeffcoat used excessive force during the course of his arrest, which Jeffcoat denies. Jeffcoat further maintains that he is entitled to qualified immunity.

The reasonableness of force used during an arrest "depends on 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Brown, at 737-38 (quoting Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002)). Jeffcoat may receive "qualified immunity for use of force during [Anderson's] arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive." Brown, 608 F.3d at 738. The court judges use of force "on a case-by-case basis . . . , rather than with the 20/20 vision of hindsight." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (internal quotation marks omitted). The court does not consider the officer's subjective belief, judging "use of force solely on an objective basis." Brown, 608 F.3d at 738. Jeffcoat's need to use force must be balanced against "(1) the severity of the crime at issue, (2) whether [Anderson posed] an immediate threat to

the safety of the officers or others, and (3) whether he [was] actively resisting arrest or attempting to evade arrest by flight." Id. (citing Vinyard, 311 F.3d at 1347).

To be entitled to qualified immunity, the force used by Jeffcoat must have been "reasonably proportionate to the need for that force, [as] measured by the severity of the crime, the danger to the officer, and the risk of flight." Vineyard, 311 F.3d at 1347 (quoting Lee, 284 F.3d at 1198). Therefore, "the application of de minimis force, without more, will not support a claim for excessive force" and will not defeat qualified immunity. Nolin v. Isbell, 207 F.3d 1253, 1257-58 (11th Cir. 2000) (granting qualified immunity to officer who grabbed and threw plaintiff against van before handcuffing him).

The court finds Gold v. City of Miami, 121 F.3d 1442 (11th Cir. 1997) [hereinafter "Gold I"] persuasive on the facts before the court. In Gold I, an officer arrested the plaintiff for disorderly conduct. After he was arrested, the plaintiff "complained to [the officer] that the handcuffs were applied so tightly that he was in pain[, but] the uniformed officer did not loosen the handcuffs until roughly twenty minutes after [the plaintiff] complained." Gold I, 121 F.3d at 1444. The Eleventh Circuit found that the plaintiff

> experienced pain from the handcuffs for roughly twenty minutes and that [the plaintiff] suffered only skin abrasions for which he did not

34

seek medical treatment. The minor nature of this injury reflects that minimal force was used to apply the handcuffs. Certainly, these circumstances would not "inevitably lead" a reasonable officer in the officers' positions to conclude that the force used to apply the handcuffs was unlawful.

Id. at 1446-47. The court affirmed that "the officers [were] entitled to qualified immunity on [the plaintiff]'s excessive force claim." Id.

Here, Anderson suffered from a *de minimis* application of force during his arrest. Specifically, Anderson's handcuffing is virtually indistinguishable from Nolin and Gold I. Anderson received only minor abrasions and bruising from the handcuffs, and an officer loosened his handcuffs, at most, fifteen minutes after he was arrested. He did not seek medical treatment. His car experienced only a few minor scratches, confirming that only a small amount of force was used to push him against his car. However, the damage to the car is not an indication of the force that Jeffcoat applied. Jeffcoat's testimony confirms that he only assisted Carr by placing the handcuffs on Anderson. Carr, not Jeffcoat, slammed Anderson onto his car. Carr's conduct is not relevant to the amount of force used by Jeffcoat. Accordingly, summary judgment is due to be granted for any claim of excessive force as to Jeffcoat, and the Third Claim against Jeffcoat is due to be dismissed.

## C. State-Law Claims Against the City, Ross, and Jeffcoat

### 1. *Slander and False Light against the City*

Anderson argues that the City slandered him or placed him in a false light by posting his arrest to Facebook. The City counters by asserting immunity under Alabama Code § 11-47-190 (LexisNexis 2008) for the claim of false light invasion of privacy and presenting truth as an absolute and complete defense to slander. The court agrees with the City.

False light necessarily requires a showing of recklessness to impose liability on the alleged tortfeasor. Walker v. City of Huntsville, 62 So. 3d 474, 502 (Ala. 2010). Under Alabama Code § 11-47-190, the City may be held liable *only* for the negligence of its employees or agents.[19] As a result, the City is entitled to immunity under § 11-47-190 for any false light claim. See Walker, 62 So. 3d at 502 ("Because [false light] requires proof that the City's agent acted knowingly or recklessly, it also falls outside those acts of neglect, carelessness, or unskillfulness for which the City may be liable under § 11–47–190.").

---

[19] Specifically, § 11-47-190 provides: "No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee . . . ." "Section 11–47–190 provides for an action against a municipality for the 'neglect, carelessness or unskillfulness' of its agents, not for their intentional torts." Franklin, 670 So. 2d 848, 850 (Ala. 1995). "In sum, under § 11–47–190, a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts of its employees." Brown, 608 F.3d at 743. Likewise, a municipality is not liable for the wanton or reckless acts of its employees. (See Doc. 38, p. 15).

At its core, slander is just a form of defamation.[20]  See Blevins v. W.F. Corp., 768 So. 2d 386, 390 (Ala. Civ. App. 1999).  Under Alabama law,

> "[t]o establish a prima facie case of defamation, the plaintiff must show [1] that the defendant was at least negligent, [2] in publishing [3] a *false* and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)."

Delta Health Group, Inc. v. Stafford, 887 So. 2d 887, 895 (Ala. 2004) (internal emphasis added) (quoting Nelson v. Lapeyrouse Grain Corp., 534 So. 2d 1085, 1091 (Ala. 1988)).  Inextricably related to the third element, "[t]ruth is a 'complete and absolute defense' to defamation."  Federal Credit, Inc. v. Fuller, 72 So. 3d 5, 10 (Ala. 2011) (quoting Battles v. Ford Motor Credit Co., 597 So. 2d 688, 692 (Ala. 1992)).  In other words, "[t]ruthful statements cannot, as a matter of law, have a defamatory meaning."  Fuller, 72 So. 3d at 10.

The City admits it published a statement via Facebook concerning Anderson.  However, the City's Facebook posting about Anderson's arrest simply was not false.  Ross and Jeffcoat arrested Anderson, which Anderson does not dispute;

---

[20]  The court notes for the record that the injury suffered by Anderson stems from libel, not slander.  Slander exclusively encompasses spoken defamatory statements, as opposed to printed, recorded, or written defamatory statements, which are encompassed by libel.  Butler v. Town of Argo, 871 So. 2d 1, 16-17 (Ala. 2003); see also Blevins, 768 So. 2d at 390.  However, the distinction between libel and slander matters only for the purposes of presumed damages.  Id.  A Facebook posting falls under the category of libel.  Because Anderson fails to satisfy the first element of defamation, however, it does not matter that Anderson mislabeled the form of defamation he complains of.

indeed, he complains about it. Anderson disputes only the lawfulness of his arrest, which does not negate the fact that Ross and Jeffcoat did arrest him and book him into jail. Anderson published a video of his arrest to Facebook, which additionally confirmed to the public that he was arrested. As such, Anderson cannot establish the falsity of the City's Facebook posting.

Accordingly, summary judgment is due to be granted for any claim of slander or false light invasion of privacy as to the City, and the Eighth Claim and part of the Ninth Claim against the City is due to be dismissed.

### 2. *Negligent Failure to Train Against the City*

It is unclear whether Anderson argues that the City maintained a policy or custom of failing to adequately trained its employees (*i.e.*, relating to the City's direct liability) or whether he argues that some unidentified individual failed to adequately train Ross and Jeffcoat (*i.e.*, relating to the City's vicarious liability under Alabama Code § 11-47-190). See Ott v. City of Mobile, 169 F. Supp. 2d 1301, 1314 n.13 (S.D. Ala. 2001) (distinguishing "the language of direct liability for one's own negligence" from the language of "vicarious liability for the negligence of another"). In theory, a municipality might be directly liable because it maintains a policy or custom of failing to adequately train employees, or it might be vicariously liable under § 11-47-190 because one or more of its employees

charged with the duty of training others does so carelessly and negligently. As explained below, neither of these theories is viable in this case.

Concerning a vicarious liability theory under §11-47-190,[21] in Rogers v. City of Selma, the Southern District of Alabama recognized that

> [h]istorically, "no Alabama court has expressly recognized a cause of action against a municipality for a supervisor's negligent training or supervision of a subordinate." Borton v. City of Dothan, 734 F. Supp. 2d 1237, 1258–59 (M.D. Ala.2010); Hamilton v. City of Jackson, 508 F. Supp. 2d 1045, 1057–58 (S.D. Ala. 2007); Ott v. City of Mobile, 169 F. Supp. 2d 1301, 1314–15 (S.D. Ala. 2001). The parties point out, however, that the Alabama Supreme Court recently called the foundation of this principle into question. Ex parte City of Montgomery, 99 So. 3d 282, 289 (Ala. 2012); see also Howard v. City of Demopolis, Ala., 984 F. Supp. 2d 1245, 1260 (S.D. Ala.2013) (evaluating Montgomery in the context of a negligent hiring, training, and supervision claim against a municipality). In Montgomery, the court rejected a municipality's claim of immunity because of its "fail[ure] to identify the individual or individuals specifically charged with the hiring, training, and supervision of the police officers, much less whether the individual or individuals are police officers entitled to State-agent immunity." Id. at 299; see also Ex parte City of Midfield, 161 So. 3d 1158, 1169 (Ala. 2014) (reaffirming the principle that it is necessary for the municipality to identify whether the hiring, training, or supervising person is a police officer in deciding whether a municipality is immune). The need to identify the hiring training and supervising individual is based on the well-established principle that, "if a municipal peace officer is immune pursuant to § 6–5–338(a), then pursuant to § 6–5–338(b), the city by which he is employed is also immune." Montgomery, 99 So. 3d 282 at 298.

---

[21]    See *supra* note 19, at 36.

178 F. Supp. 3d 1222, 1249-50 (S.D. Ala. 2016). Thus, if the plaintiff's theory is that the municipality is vicariously liable under § 11-47-190 and the employee charged with training responsibilities is a police officer, not only is the officer himself immune under Alabama Code § 6-5-338, but the municipality itself is also immune.

Because the purported cause of action based on vicarious liability arises under § 11-47-190, "[f]or the employer to be liable under that doctrine, the employee must first be liable for a tort." Ott, 169 F. Supp. 2d at 1314. Otherwise the principal cannot be held liable. Id. Therefore, Anderson "must show that Alabama law recognizes a cause of action against a [training] employee for the negligent training . . . of a subordinate." Id. Stated differently, to attach liability to a municipality vicariously, the plaintiff must show that the city employee charged with training subordinates was himself negligent in carrying out his training duties. Absent some negligence or carelessness by a city employee within the meaning of § 11-47-190, the municipality cannot be liable itself.

However, such a cause of action does not exist in Alabama because of the legal requirement that a master-servant relationship must exist. An employee tasked with training other employees is not the employer of the trainee. Id. A negligent failure to train can exist only because it is the employer's duty to train; the trainer has no legal duty running to persons injured by a subordinate's lack of

training. Because Anderson has no cause of action against the individual(s) tasked by the City of Homewood with training Ross and Jeffcoat, the City cannot be held vicariously liable under § 11-47-190 for that individual's negligent training of Ross and Jeffcoat. Id. Absent some actionable tort by the trainer against Anderson, there is no basis for holding the City vicariously liable.

Moreover, even assuming a negligent training cause of action exists based upon Ex parte City of Montgomery and Ex parte City of Midfield, 161 So. 3d 1158, 1168-69 (Ala. 2014), Anderson has not produced any evidence indicating that the City had actual or constructive knowledge of Ross and Jeffcoat's inadequate training. See Borton v. City of Dothan, 734 F. Supp. 2d at 1259; see also Howard v. City of Demopolis, 984 F. Supp. 2d 1245, 1260 (S.D. Ala. 2013); Rogers, 178 F. Supp. 3d at 1250.

Finally, under a direct theory of liability, to the extent that Anderson maintains that the City had a policy or custom of failing to adequately trained its employees, Anderson has failed to produce evidence to support such a theory. He has not shown that the City maintains a policy or custom of failing to provide adequate training to police officers. Accordingly, summary judgment is due to be granted for any claim of negligent failure to train as to the City, and part of the Ninth Claim and the Eleventh Claim against the City are due to be dismissed.

### 3. *Remaining State-Law Claims against the City, Ross and Jeffcoat*

The defendants argue that Alabama Code § 6-5-338(a) (LexisNexis 2014) provides immunity for Ross and Jeffcoat, and as a result of Ross and Jeffcoat's immunity, § 6-5-338(b) provides immunity to the City. Specifically, § 6-5-338 states:

> (a) Every peace officer and tactical medic, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer or tactical medic by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers or tactical medics, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

> (b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers. No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours.

Under Alabama precedent, "if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune. Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003).

Importantly, state-agent immunity, as established by Ex parte Cranman, 792 So. 2d 392, 405 (Ala.2000), "governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a)." Ex parte City of Montgomery, 99 So. 3d at 292. Under state-agent immunity,

> [a] State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons . . . .

Cranman, 792 So. 2d at 405. However,

> [n]otwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity
>
> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Id.  Furthermore, "[b]ecause the scope of immunity for law-enforcement officers set forth § 6–5–338(a) was broader than category (4) of the restatement adopted in Cranman, [the Alabama Supreme Court] in Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala. 2006), expanded and modified category (4) of the Cranman test." Ex parte City of Montgomery, 99 So. 3d at 293.  Therefore, Alabama Code § 6-5-338(a) has been reconciled with state-agent immunity under Cranman as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, *or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a)* . . . .

Hollis, 950 So. 2d at 309 (internal emphasis in original).

Under this form of immunity, Ross and Jeffcoat must first "establish (1) that they were peace officers (2) performing law-enforcement duties at the time of the [incident] and (3) exercising judgment and discretion."  Ex parte City of Homewood, 231 So. 3d 1082, 1087 (Ala. 2017).  Anderson does not dispute that Ross and Jeffcoat "were employed as law-enforcement officers by" the City; "therefore, they are 'peace officers' for the purposes of § 6-5-338(a) . . . ."  Id.  Indeed, Anderson affirmatively alleged that they were acting as duly-sworn police

officers for the City of Homewood. Furthermore, Anderson has not disputed that Ross and Jeffcoat "were performing law enforcement duties at the time of the" BLM protest. Id. Finally, Ross and Jeffcoat arrested Anderson, which "is a discretionary function" and satisfies the third element. See Ex parte City of Homewood, 231 So. 3d at 1087-88. The Alabama Supreme Court has "applied the standard of "arguable probable cause" in determining whether a police officer was immune from plaintiff's false-arrest claim pursuant to the immunity provided police officers in § 6–5–338(a)." Ex parte Harris, 216 So. 3d 1201, 1213 (Ala. 2016) (citing Borders v. City of Huntsville, 875 So. 2d 1168, 1179-80 (Ala. 2003)). Anderson admitted that the officers on the scene at Wal-Mart were "having to make judgment calls." (Doc. 54-4, p. 241, ll. 3-18).

Because Ross and Jeffcoat have satisfied their burden, the burden now "shifts to [Anderson] to show that one of the two categories of exceptions to State-agent immunity recognized in Cranman is applicable." Ex parte City of Homewood, 99 So. 3d at 293 (quoting Ex parte Kennedy, 992 So. 2d 1276, 1282-83 (Ala. 2008)). Anderson has not argued that the first Cranman category applies. Therefore, the court considers only whether the second Cranman category applies.

a. False Arrest and False Imprisonment

Importantly, a finding of arguable probable cause precludes a finding that an officer "acted 'willfully, maliciously, fraudulently [or] in bad faith' so as to

remove him from the umbrella of State-agent immunity afforded him under Ex parte Cranman." Ex parte Harris, 216 So. 3d at 1214. Because the court determined earlier in Section IV.B.2. that Ross and Jeffcoat possessed arguable probable cause to preclude liability on these claims, § 6-5-338(a) provides immunity to Ross and Jeffcoat. Brown, 608 F.3d at 741-42 (because officers were qualifiedly immune from § 1983 claims due to arguable probable cause, officers were also entitled to immunity under § 6-5-338(a) from state-law false arrest claim). As a result, Ross and Jeffcoat's immunity extends to the City under § 6-5-338(b). See Howard, 887 So. 2d at 211. Accordingly, summary judgment is due to be granted for any state-law claim of false arrest or false imprisonment as to the City, Ross, and Jeffcoat, and part of the Ninth Claim against the City, Ross, and Jeffcoat is due to be dismissed.

b. Gross Negligence

Gross negligence is not enough to overcome the immunity afforded law enforcement officers under § 6-5-338(a). See Miller v. Bailey, 60 So. 3d 857, 867 (Ala. 2010) ("'Gross negligence' is negligence"). Therefore, if a claim of gross negligence had been brought against Ross and Jeffcoat, § 6-5-338(a) would provide immunity to them. Because Ross and Jeffcoat would be immune from any claim of gross negligence under § 6-5-338(a) (see doc. 35, p. 33), the City likewise is immune from any claim of gross negligence under § 6-5-338(b). See Howard,

887 So. 2d at 211. Anderson has failed to come forward with any evidence suggesting that any other employee of the City was negligent, gross or otherwise. Accordingly, summary judgment is due to be granted for any claim of gross negligence as to the City, and the Second Claim against the City is due to be dismissed.

c. Assault and Battery

Generally, to establish an assault and battery, the plaintiff "must prove '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" Dolgencorp, LLC v. Spence, 224 So. 3d 173, 180 (Ala. 2016) (quoting Harper v. Winston City, 892 So. 2d 346, 353 (Ala. 2004)). However, the matter is complicated when a law enforcement officer arrests an individual. In the law enforcement context, an excessive force theory "is the equivalent of asserting an assault and battery not measured or patterned for the circumstances." Franklin, 670 So. 2d 848, 852 (Ala. 1995). When making an arrest, "a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest." Id. (citing Ala. Code § 13A-3-27 (LexisNexis 2015)). Importantly though, "before any force can be used in making an arrest, probable cause must exist to make a lawful arrest." Id.

In Sheth v. Webster, 145 F.3d 1231 (11th Cir. 1998), Officer Webster was dispatched to a motel when a dispute over money between Sheth, the owner of a motel, and a tenant broke out. Eventually, a dispute between Sheth and Officer Webster developed, and Officer Webster made the decision to arrest Sheth. After arriving at the scene, Sergeant Williams finished handcuffing Sheth after Officer Webster requested help. The Eleventh Circuit determined that the evidence did "not support claims of willfulness, bad faith or malice on the part of Sergeant Williams, as it pertain[ed] to the specific claim[] of assault and battery." Sheth, 145 F.3d at 1239. The Eleventh Circuit reasoned that

> Sergeant Williams did not make the decision to arrest the plaintiff. There is no evidence that he knew that the arrest was unlawful, or that he knew that the use of force in subduing and handcuffing the plaintiff was unreasonable, or that he had any hand in the prosecution of the plaintiff. Sergeant Williams merely assisted Officer Webster. . . . Based upon these facts and Sergeant Williams' more limited role in this incident, the court cannot conclude that Sergeant Williams violated clearly established law. . . . It is certainly not clear that Sergeant Williams should have known that his actions violated the state laws he is accused of violating.

Id. Although not automatic, the Eleventh Circuit concluded with the determination that an officer who is entitled to qualified immunity likely "establish[es] that his acts were not willful, malicious or in bad faith." Id. at 1240.

Here, Jeffcoat arrived at the scene in time to see Ross ask Southall for identification. He participated in the initial attempt to arrest Southall and then

stepped back.  When he noticed that Carr and Anderson were struggling, Jeffcoat

assisted with Anderson's arrest by handcuffing Anderson, similar to Sergeant

Williams' actions in Sheth.[22]  The court already has determined that Jeffcoat

possessed arguable probable cause that entitled him to qualified immunity as to the

federal-law excessive force claim brought against him.  The finding of arguable

probable cause in this situation precludes a finding that Jeffcoat acted willfully,

maliciously, in bad faith, or in an unreasonable manner.  Further and equally as

important, Anderson has not come forward with evidence indicating that Jeffcoat

acted willfully, maliciously, in bad faith, or in an unreasonable manner.  Therefore,

§ 6-5-338(a) provides immunity to Jeffcoat.

Because Jeffcoat is immune from any claim of assault and battery under § 6-

5-338(a), the City likewise is immune from any claim of assault and battery under

§ 6-5-338(b).  See Howard, 887 So. 2d at 211.  Accordingly, summary judgment is

due to be granted for any claim of assault and battery as to the City and Jeffcoat,

and the Tenth Claim against the City and Jeffcoat is due to be dismissed.

---

[22]  To the extent Anderson asserts his assault and battery claim against Ross, the evidence is undisputed that Ross never touch the plaintiff.  Although Ross made the decision to arrest Anderson, it was Carr and Jeffcoat, not Ross, who actually did so.

## D. Negligent Failure to Train Against Wal-Mart[23]

Wal-Mart argues that Anderson failed to come forward with any evidence to support a claim of negligent failure to train against Wal-Mart. To establish a negligent failure to train, Anderson must first establish that Roberts committed a tort, see Stevenson v. Precision Standard, Inc., 762 So. 2d 820, 824 (Ala. 1999), and then the tort was the product of Wal-Mart's failure to properly train Roberts. Anderson, however, cannot merely allege or show "that the employee acted incompetently." Armstrong Business Services, Inc. v. AmSouth Bank, 817 So. 2d 665, 683 (Ala. 2001). In Armstrong, the Alabama Supreme Court reiterated that

> [i]n the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and

---

[23] The Order Regarding Motions to Dismiss (doc. 36) states that a claim for negligent, wanton, or intentional failure to train or supervise under the Ninth and Eleventh Claims remains pending. Upon closer examination of the complaint, however, Anderson alleged only a negligent failure to train or supervise. Accordingly, the court pretermits any discussion of wanton or intentional failure to train because the complaint does not allege wanton or intentional conduct with respect to this claim.

> incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

Id. at 682. In other words, Anderson must prove that Wal-Mart had actual or constructive notice of Robert's incompetence or tortious conduct and that Wal-Mart failed to adequately respond to it. See id. at 682-83.

Here, even assuming that Anderson has sufficiently disputed whether Roberts committed a tort (*i.e.*, the tort of malicious prosecution), Anderson failed to come forward with any evidence that Wal-Mart knew or should have known about any deficiency in Roberts' training that caused him to sign the complaint against Anderson. In fact, Roberts received significant training, including on-going training, regarding the signing of criminal trespass complaints, which negates the inference that Wal-Mart knew or should have known about a deficiency. From Wal-Mart's perspective, Roberts' training was sufficient. Anderson does not even point to how the training Roberts received was deficient. Even if Anderson had done so, this would not establish the next step of proving Wal-Mart's actual or constructive knowledge. Accordingly, summary judgment is due to be granted for any claim of failure to train as to Wal-Mart, and part of the Ninth Claim and the Eleventh Claim against Wal-Mart is due to be dismissed.

## I.    CONCLUSION

Accordingly, both motions for summary judgment (docs. 49 and 54) are due to be GRANTED, and all of Anderson's federal-law and state-law claims are due to be DISMISSED WITH PREJUDICE, except for the due process and equal protection claim against the City under the First and Fourth Claims, which remain pending.

Due to the court's error in the Memorandum Opinion and Order (docs. 35, 36) concerning the pending due process and equal protection claim against the City under the First and Fourth Claims,[24] the City may file a Motion for Summary Judgment as to this claim within twenty-one (21) days of the entry of this order. Any response should be filed within twenty-one (21) days of the filing of the motion. A reply, if any, may be filed within fourteen (14) days of the response.

A separate order will be entered.

DONE this 12th day of June, 2018.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

---

[24]    In both the Memorandum Opinion (doc. 35) and the separate Order (doc. 36), the court erroneously omitted the plaintiff's claims that he was denied due process of law and equal protection of the law by the City, as alleged in his First and Fourth Claims. These claims were pleaded in the First Amended Complaint and have not been addressed due to the court's oversight.